R. G. TRIPPETT, AS TRANSFEREE OF TEXOTA CORPORATION, DISSOLVED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

A. H. MEADOWS, AS TRANSFEREE OF TEXOTA CORPORATION, DISSOLVED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TEXOTA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 93100, 93111, 93112. Promulgated May 28, 1940.

*W. H. Sanford*, Esq., and *Harry L. Viser*, C. P. A., for the petitioners.

*Paul E. Waring*, Esq., for the respondent.

## 1258

OPINION.

BLACK: In the instant case the facts clearly show that prior to the time that Texota conveyed the lease in question to Meadows and Meadows and Trippett conveyed it to Rancho, Meadows and Trippett had entered into a binding contract with Rancho to sell the lease. This contract was signed by Meadows and Trippett, individually, as sellers and Rancho as purchaser, and nowhere in the contract does the name of Texota appear. Meadows and Trippett both testified at the hearing that they signed the contract with Rancho, individually, because they fully intended to liquidate the corporation at an early date thereafter and thereby become the owners of the lease in their own individual right upon receiving it in liquidation. They further testified that they intended thereafter to convey the lease to Rancho as individuals in fulfillment of their contract. They contend that the transactions were consummated according to the plan and that Texota is not taxable on the profits.

Under the circumstances detailed in our findings of fact, should we hold that the contract of sale made by Meadows and Trippett with Rancho on December 20, 1934, must be treated as the contract of Texota, as seller? If, under the law, we should so hold, then we must hold that the subsequent sale which Meadows and Trippett made on Janu-

ary 5, 1935, to Rancho was made by them as agents and representatives of Texota and that the profits from the sale are taxable to Texota. *Hellebush* v. *Commissioner*, 65 Fed. (2d) 902; *Burnet* v. *Lexington Ice & Coal Co.*, 62 Fed. (2d) 906; *Taylor Oil & Gas Co.* v. *Commissioner*, 47 Fed. (2d) 108; *S. A. MacQueen Co.*, 26 B. T. A. 1337; affd., 67 Fed. (2d) 857.

We think we must hold that the contract entered into by Meadows and Trippett on December 20, 1934, was one entered into for the benefit of Texota and therefore must be treated as its contract. True it is that Texota's name is not mentioned in the contract, but Meadows and Trippett were the directors and sole stockholders of Texota. Meadows was its president and the two of them were in charge of its affairs. The lease was concededly owned at that time by Texota.

In the contract of sale which Meadows and Trippett made with Rancho on December 20, 1934, the following language appeared in the second paragraph: "Sellers shall deliver to purchaser, at its office in the Sinclair Building, Fort Worth, Texas, within three (3) days after the date of this contract complete abstracts of title certified to date, covering the above described property  *  *  *." If this part of the contract was carried out, and there is no suggestion that it was not, then of course the abstracts of title showed that title to the property was in Texota, and Rancho must have known that it was really purchasing from Texota.

Of the several cases above cited, the one which we think comes nearest the facts of the instant case is *S. A. MacQueen Co.* The facts in that case are briefly as follows: On February 1, 1927, at a meeting of the three stockholders who owned the entire outstanding stock of the MacQueen Co. and were also its directors, a resolution was passed authorizing the board of directors to sell real estate owned by the corporation to S. A. MacQueen, its president, director, and majority stockholder, for the sum of $85,000. Following that meeting and on the same day, a resolution was adopted by the board of directors accepting an offer by MacQueen of $85,000 for the real estate. The following day, while the corporation was yet the owner of the property, MacQueen entered into an agreement with Henry Reed Hatfield to convey the real estate to the latter for a consideration of $150,000. On February 11, 1927, in conformity with a prior understanding among the three stockholders, MacQueen executed a declaration of trust in which he recited the agreement of the corporation to convey the real estate to him for $85,000, his agreement to convey the same to Hatfield for $150,000, and his intention to distribute the profits to the stockholders in proportion to their holdings. On March 1, 1927, the MacQueen Co. conveyed title to MacQueen and

on the same day MacQueen conveyed title to Hatfield. Subsequently MacQueen, in accordance with his declaration of trust, distributed $65,324.30, representing the profits of the sale and interest thereon, to himself and the other two stockholders.

On these facts we held that the sale to Hatfield was made by the corporation, S. A. MacQueen Co., and it was taxable on the profits resulting from the sale. The court in affirming our decision, among other things, said:

\* \* \* Although in form there were two sales of the corporate real estate, first, the purported sale by the petitioner to MacQueen, and second, the sale by MacQueen to Hatfield, in substance the transaction was a sale by the petitioner to Hatfield through the agency of MacQueen. So also, although in form MacQueen was a trustee for the distribution of the profits earned by the sale of his own real estate to Hatfield, in substance he was the agent of the petitioner for the distribution of the profits from the sale of the corporation's real estate among its stockholders.

In the instant case the purported sale by Texota to Meadows on January 5, 1934, was for $10 and other valuable considerations. In the *MacQueen* case the purported consideration passing from S. A. MacQueen, president, to the corporation was $85,000. As a matter of fact no consideration at all passed from MacQueen to the corporation, just as here no consideration passed from Meadows to Texota. And, just as we held in the *MacQueen* case that the corporation made the sale to the purchaser, notwithstanding the intermediate conveyance by the corporation to MacQueen, its president, so we think we must hold in the instant case that Texota made the sale to Rancho, notwithstanding the intermediate conveyance by Texota to Meadows, its president. Of course, the facts and circumstances of the *MacQueen* case and the other cases cited above are not identical with those in the instant case, but we think they are sufficiently near the same that those decisions must control our decision here.

Petitioner relies largely upon *Fruit Belt Telephone Co.*, 22 B. T. A. 440, and *Conservative Gas Co.*, 30 B. T. A. 552, in support of its position. We think these cases are clearly distinguishable on their facts. In both of these cases the Board pointed out that no binding contract of sale had been entered into by the corporation, or by anyone else acting as its agent, and the proposed purchaser prior to the transfer of the assets to the stockholders. In *Conservative Gas Co., supra*, in distinguishing a group of cases similar to those which we have cited above, we said:

\* \* \* In each we held that the trustee or assignee merely acted for the corporaion in consummating a transaction initiated by it. In *Nace Realty Co., supra*, we pointed to this fact as controlling and distinguished *Fruit Belt Telephone Co.*, 22 B. T. A. 440, on this ground, observing: "So far as appears, the

corporation [Fruit Belt Telephone Co.] had made no contract for the sale of its assets prior to their transfer to the individual. That fact alone is sufficient to distinguish the case from the case now at bar."

We should also point out, we think, that the facts in the instant case are distinguishable from those present in *Falcon Co.*, 41 B. T. A. 1128. In that case, prior to any contract of sale, the corporation distributed in partial liquidation the eight leases which were subsequently sold. The stockholders turned in their stock and 60 percent thereof was canceled as a part of the plan of partial liquidation. Thereafter the capital stock of the corporation was only 40 percent of what it was before. After the stockholders received the leases in liquidation, they entered into a contract on their own account to sell the leases to the East Texas Oil Refining Co. and in pursuance thereof the leases were subsequently sold to the named purchaser for the consideration specified in the contract. Under those circumstances we held that the sale of the leases was made by the stockholders to whom the leases were transferred in partial liquidation and was not made by the corporation, and that the corporation was not taxable on the profits resulting from the sale.

As we have already endeavored to point out, we do not have a similar situation in the instant case. On the strength of the authorities hereinbefore cited we hold for the respondent.

Reviewed by the Board.

*Decision will be entered for the respondent.*